Action to recover damages for injuries alleged to have been caused by defendant's negligence. Plaintiff, at the time 16 or 17 years old, was employed by defendant, with the promise of the manager that he should work outside the mill in a safe place. He was ordered to go inside the mill and tail the moulder, which appears to be a dangerous machine to one not familiar with its construction and operation, and was severely injured the next day by having his hand caught in the knives of the moulder.
Plaintiff testified: "I am the plaintiff in this action. Up to the time of the injury, I lived with my father and helped on the farm. I never had been about machinery. I reported for work to Will Oliver, defendant's foreman, on the morning of 5 July, 1906. He put me to loading lumber on a car on the yard. About 10 o'clock he instructed me to go inside the building and work at the moulding machine. I didn't know what a moulding machine was. I asked one of the men what he (689) wanted me to do, and he said keep the lumber up and keep it graded. I said I didn't know anything about grading it, but I could keep it up. I went to work tailing the moulder. I never had seen a moulder. No one made a statement to me about the danger of the machine. Joe Davis was feeding the machine at the time. I was to receive the lumber after it came out of the machine. No one was working at the machine except Davis and myself. The machine was run by steam power. The knives where I got cut make about 3,500 revolutions a minute. They were about one-eighth inch above the surface of the machine. They were not explained to me, and I had never seen the machine stopped and it looked just like a solid piece of iron. I was hurt the next day about 2 o'clock; had been working at the machine about fourteen hours. The machine had two knives. About 2 o'clock on the second day we were cutting a piece of ceiling and I didn't know anything about how ceiling had to be dressed. I was a green man there. We let about 500 feet go through with just the top bead cut. Oliver came along about 1 o'clock and saw it and began rearing on me; cursed me because I let it run through there wrong. I asked him why he didn't show me how it was to be cut. I said he never showed me anything. About 2 o'clock there was a faulty piece of lumber coming through, and the bits *Page 597 
or knives took too much hold on the lumber. A big splinter got hung over the knives. I didn't know the knives were there. It stopped the board from coming through. I motioned to Davis, gave him a signal that there was something wrong. He stopped the feed and motioned to me to loose the pressure bar over the knives. I did so. He started around to where I was, but before he got to me I stuck my hand in after the splinter. There is a suction pipe that carries the shavings to the boiler room for fuel. The suction pipe jerked my hand into the knives. I didn't know the suction pipe was there. I hadn't been told it was there. Nobody had told me the knives were there, and I couldn't see them. I had never seen the knives. There was nothing over the knives to protect except the pressure bar and a board some 5 inches above the bar; no hood. I jerked my hand out and fell back in Mr. Davis's arms. I said: (690) `My hand is all cut up; send for the doctor; don't let me bleed to death; you ought to have told me about those knives being there. I didn't know the knives were there.'"
His father, J. B. Ensley, testified: "I asked McKee to give him (my son) work on the outside of the building where there wasn't any machinery; that my son was young and awkward and didn't know anything about machinery. McKee said he would try to do so, or would do so. That is about all the contract there was to it. The company was handling and sawing logs outside of the building. McKee said he would give him work on the outside. He was injured the second day after he went to work; went to work one day and was injured about 2 o'clock the next day. His hand was torn up and two of his fingers cut off. It was bloody and looked like it was cut all to pieces."
There was testimony for the defendant tending to show that the injury was not caused by any negligence on its part, but by plaintiff's own negligence, and the conflicting evidence was submitted to the jury by the court to find the facts. The jury returned the following verdict:
1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint? Answer: Yes.
2. Did the plaintiff, by his own negligence, contribute to his injury, as alleged in the answer? Answer: No.
3. Did the plaintiff assume the risk of approaching the machinery and putting his hand in the box containing the knives, as alleged in the answer? Answer: No.
4. What damages, if any, is the plaintiff entitled to recover? Answer: Two thousand dollars ($2,000).
Judgment thereon, and appeal by defendant. *Page 598 
(691) After stating the case: The plaintiff alleges that he was young and inexperienced, not having worked in a mill before; that for this reason his father had requested the defendant to give him work to do outside the machinery room, which the latter promised to do, but which it failed to do, but on the contrary, he was ordered to work in the building and was required to tail at a moulding machine, which means that he had to receive the lumber from the moulder after it was dressed by being passed through it. In operating the machine and doing the work of tailing, it was proper and usual to stand about 4 feet from it; but on the day of the injury a large splinter or faulty piece of lumber caused the bits or knives to grip it too tightly; the splinter hung on the knives and stopped the lumber. At this time he called to Davis, who stopped the feed and told him to loosen the pressure bar over the knives, which he did, and then put his hand in and reached for the splinter to remove it, when the suction from the pipe that carries the shavings to the boiler drew his hand to the knives, and he was badly cut by them. He says: "I did not know the knives were there, nor did I know the suction pipe was there." There was no shield or hood over the knives.
The case has been argued before us upon the theory that there was no negligence of the defendant, and that plaintiff assumed the risk of his employment, or was guilty of contributory negligence when he undertook to stop the machine and thrust his hand into it for the purpose of doing so, and further, that he was not acting within the scope of his duties when he did so.
It is the duty of the master to exercise due care in furnishing his servant with a reasonably safe place to work and reasonably safe and proper machines, tools, and appliances with which to do the work, and, in the case of youthful or inexperienced employees, this further duty rests upon him: Where the master knows, or ought to know, the dangers of the employment, and knows, or ought to know, that the servant, by reason of his immature years or inexperience, is ignorant of or unable to appreciate such dangers, it is his duty to give him such instruction and warning of the dangerous character of the employment as (692) may reasonably enable him to understand its perils. But the mere fact of the servant's minority does not charge the master with the duty to warn and instruct him, if he in fact knows and appreciates the dangers of the employment; and generally it is for the jury to *Page 599 
determine whether, under all the circumstances, it was incumbent upon the master to give the minor, at the time of his employment, or at some time previous to the injury, instructions regarding the dangers of the work, and how he could safely perform it. It is the duty of a master who employs a servant in a place of danger to give him such warning and instruction as is reasonably required by his youth, inexperience, or want of capacity, and as will enable him, with the exercise of reasonable care, to perform the duties of his employment with reasonable safety to himself. 26 Cyc., 1174-1178; Turner v. Lumber Co., 119 N.C. 387; Marcus v. Loan, 133 N.C. 54;Walters v. Sash and Blind Co., 154 N.C. 323; Fitzgerald v. FurnitureCo., 131 N.C. 636; Rolin v. Tobacco Co., 141 N.C. 300; Leathers v.Tobacco Co., 144 N.C. 350. Those cases fairly illustrate the rule as it has been applied by this Court, and the Fitzgerald case would seem to be essentially the same in its salient facts as this one, and if not entirely so, there is a sufficient likeness between them to make it a controlling authority. The authorities elsewhere are in harmony with our decisions.
"The master may also be guilty of actionable negligence in exposing persons to perils in his service which, though open to observation, they, by reason of their youth or inexperience, do not fully understand and appreciate, and in consequence of which they are injured. Such cases occur most frequently in the employment of infants. The duty of the employer to take special cautions in such cases has sometimes been emphatically asserted by the courts." Cooley on Torts, p. 652.
"The law puts upon a master, when he takes an infant into his service, the duty of explaining to him fully the hazards and dangers connected with the business, and of instructing him how to avoid them. Nor is this all; the master will not have discharged his duty in this regard unless the instructions and precautions given are so graduated to the youth, ignorance, and inexperience of the servant as to make him fully aware of the danger to him, and to place him, with reference to (693) it, in substantially the same state as if he were an adult." Thompson on Negligence, 978.
"When the negligent act of the defendant naturally induced or offered opportunity for the subsequent act of a child, being of a character common to youthful indiscretion, and which, concurring with the defendant's earlier wrongful act, produced the injuries complained of, the defendant will in general be held liable. Children, wherever they go, must be expected to act upon childish instincts and impulses — a fact which all persons who are sui juris must consider, and take precautions accordingly. A person who places in the hands of a child an article of a dangerous character and one likely to do an injury to the child itself or to others, is *Page 600 
liable in damages for injury resulting which is a natural result of the original wrong, though there may be an intervening agency (of the child) between the defendant's act and the injury." Bailey on Personal Injuries, 1291.
It was said in R. R. v. Fort, 84 U.S. 553, in which a parent was suing for injuries to his son, who was 16 years old: "This boy occupied a very different position (from an adult). How could he be expected to know the peril of the undertaking? He was a mere youth without experience, not familiar with machinery. Not being able to judge for himself, he had a right to rely on the judgment of Collett, and doubtless entered upon the execution of the order without apprehension of danger. Be this as it may, it was a wrongful act on the part of Collett to order a boy of his age and inexperience to do a thing which, in its very nature, was perilous, and which any man of ordinary sagacity would know to be so."
It appeared in Lynch v. Nurdin, 41 E. C. L. Rep., 422, that the defendant's servant had left a horse and cart unhitched on the street, and plaintiff, with other children, was playing with the horse and climbing into the cart, when the horse moved away and injured him. The defendant set up the same defense as does the defendant in this case, that the minor had brought the injury upon himself by his own negligence and (694) reckless act, but Lord Denmam, the Chief Justice of the King's Bench, after discussing the careless act of leaving the horse unhitched, said: "But the question remains, Can the plaintiff, then, consistently with the authorities, maintain his action, having been at least equally in fault? The answer is that, supposing that fact ascertained by the jury, but to this extent, that he merely indulged the instinct of a child in amusing himself with the empty cart and deserted horse, then we think that the defendant cannot avail himself of that fact. The most blamable carelessness of his servant having tempted the child, he ought not to reproach the child with yielding to that temptation. He has been the real and only cause of the mischief. He has been deficient in ordinary care; the child, acting without prudence or thought, has, however, shown these qualities in as great a degree as he could be expected to possess them."
The general principle is well stated and tersely applied in Iron Co.v. Green, 65 S.W. Rep. (Tenn.), 399, where the same defense was made, as here, that the plaintiff's wrongful employment of the child was not the proximate cause of the injury, and the Court said: "Defendant had no right to employ this minor. While in its employment on its premises and foolishly playing with panels, the property of the company, too heavy for his strength to hold, yet with boyish heedlessness disregarding *Page 601 
this fact, this injury is inflicted upon him. Had he not been employed by this defendant, there is no reason to suppose that he would have been on its premises when the temptation occurred to him to prank with these panels to his serious hurt. In each of the propositions presented by the respective parties to the suit we think there is causal connection between the employment and the injury."
Of course, we do not hold that the employment of the boy was negligence per se merely because he was under age, but the principles of those cases apply for the reason that, as the evidence shows, the father of the boy had warned the defendant, not only of his youth, but of his inexperience as well, and exacted a promise that he would not be employed in the building about dangerous machinery, and after receiving this precautionary request and agreeing to comply with it, defendant (695) violated the promise (Hanie v. Power Co., 157 N.C. 503), and, besides, exposed this inexperienced youth to the dangers of the machinery without any instructions as to what they were or as to how he could avoid them. It cannot, therefore, be heard to say, if we follow established principles in the law of negligence, that the injury is to be imputed to his own fault, when his alleged negligent act was directly induced by its own negligence in failing to take proper care of him when thus exposed to danger.
Discussing the analogy between the duties of employers to youthful employees and the duty owing to those who are inexperienced, 1 Shearman and Redfield on Negligence (6 Ed.), sec. 219 and 219a, thus states the rule applicable to both of these relations: "It is the duty of one who employs young persons in his service to take notice of their apparent age and ability and use ordinary care to protect them from risks which they cannot properly appreciate, and to which they ought not to be exposed. This is a duty which cannot be delegated; and any failure to perform it leaves the master subject to the same liability, with respect to such risks, as if the child were not a servant. For this purpose, the master must instruct such young servants in their work and warn them against the dangers to which it exposes them, and he must put this warning in such plain language as to be sure that they understand it and appreciate the danger. . . . The principles governing the employment of minors are, to a large degree, also applicable to the employment of inexperienced, ignorant, feeble, or incompetent servants. A master having notice of any such defect in a servant, no matter what his age may be, is bound to use ordinary care to instruct the inexperienced or ignorant and to avoid putting the feeble to work too heavy for their strength, and generally to refrain from exposing them to risks which they are not fit to encounter. When the master has notice of such ignorance or inexperience on the *Page 602 
part of the servant as would make the ordinary risks of the business especially perilous to that servant, he must give the servant (696) explicit warning of the danger, and not allow him to under take the work without a full explanation of its perils."
It will be seen, therefore, that the duty of the employer in both cases is practically the same. If the particular act of removing the splinter so as to start the machine again was not strictly within the scope of the boy's duty, it was not such a departure from it as to disconnect or insulate the prior negligence of the defendant from the injury, and it was due altogether to the youth and inexperience of the boy and the lack of proper instruction as to the dangers to be anticipated and avoided in handling the moulder. "Where there is evidence tending to show that an injured employee did not have a reasonably safe place to work, or was not instructed as to the danger attending the act he was told to do, the question whether it was a reasonably safe place to work or whether the failure to warn him of the danger was the proximate cause of the injury, should be submitted to the jury. The evidence that there was a safe way to do this act did not warrant the withdrawal of the case from the jury, in view of the evidence in the case. When more than one inference can be drawn as to the negligence, or the proximate cause, it is for the jury to determine. Dorsett v. Manufacturing Co., 131 N.C. 254; Marks v. CottonMills, 138 N.C. 401." Holton v. Lumber Co., 152 N.C. 68.
We have carefully examined the charge of the court, and find it to be in strict accordance with the law of the case as now declared by us. The court fully instructed the jury as to the duty of the defendant toward the plaintiff, and as to the latter's measure of duty to himself, considering his age and capacity for taking care of himself and avoiding danger. The charge, in all respects, was "sound and judicious" and presented the case to the jury clearly and correctly in every conceivable phase of it. It was for the jury to find the facts and apply the law as given to them by the court, and we can see no reason for interfering with the result.
No error.
Cited: Raines v. R. R., 169 N.C. 192 (2g); Holt v. Mfg. Co.,177 N.C. 175 (1f); Sutton v. Melton, 183 N.C. 372 (1g);Bellamy v. Lumber Co., 183 N.C. 435 (1g); Gaither v. Clement,183 N.C. 456 (1c); Pettitt v. R. R., 186 N.C. 10, 12
(1g); Satchell v. McNair, 189 N.C. 474 (1p); Boswell v. Hosiery Mills,191 N.C. 556 (1c); Mehaffey v. Construction Co., 197 N.C. 24
(1c); Mills v. Mfg. Co., 198 N.C. 146 (2g); McLaughlin v. Black,215 N.C. 86 (1f); Lee v. Roberson, 220 N.C. 62 (1g). *Page 603 
(697)